Good morning, everyone. Welcome to the Ninth Circuit here in San Francisco on a beautiful day. We have Judge Gould joining us by video. Judge Gould, can you hear us okay? Yes, I can hear you. All right, I'll be calling the calendar in the cases, in the order that the cases are presented. The first one, Gonzalez-Monzo v. Blanche have been submitted on the briefs and record. So the first case up for argument is George v. U.S. Office of Navajo and Hopi Indian Relocation. When you're ready, counsel. Could I reserve two minutes for rebuttal? All right. Thank you. Please keep your eye on the clock. I'll try to remind you. Thank you, Your Honor. My name is Barry Paisner. I represent Rosita George, a Navajo relocatee and the appellant in this matter. I will address in this argument three issues where the hearing officer's findings were arbitrary and capricious, not supported by substantial evidence and not in accordance with law. First, the hearing officer's decision that Ms. George did not meet her burden of proof that she was self-supporting as of July 7th, 1986, should be overturned. Second, the hearing officer's credibility findings violated substantial evidence and this court's holding in Sosi infusion and also should be overturned. Third, Oner's delay, that's how I'm going to refer to the agency, delay of the administrative proceeding violated due process, the APA, and Oner's regulations and trust obligation. Ms. George has proven that she was self-supporting by July 7th, 1986. Well, counsel, let me ask you this. As you acknowledge, it is substantial evidence, which is deferential review. So what do we do with the inconsistencies that was pointed out as a basis for an adverse credibility finding? With the adverse credibility findings? Yes. Your Honor. But the first two issues you identified are interrelated, right? Because if she's not credible, then I think that presents a problem in terms of whether she's met her burden of proving the requisite head of household income that's required. Right. Yes, Your Honor. It is a problem. However, this hearing officer has consistently been overturned by the district court and this court for his credibility findings. Right. But to the extent that there were inconsistencies, what do we do with that? Well, the inconsistencies the hearing officer found were that Ms. George and her aunt, Ms. Sands, were internally inconsistent with each other. But the trouble with that finding is he has found each of these individuals inconsistent. I mean, I'm sorry, not credible. So it's kind of a circular logic, Your Honor, that he finds Ms. Sands not credible, he finds Ms. George not credible, and then he says because these non-credible witnesses are inconsistent with each other, therefore Ms. George is not credible. And the Fusen case specifically ruled on that, calling it a catch-22 for the applicant where no individual will be found credible and set it aside. What the Fusen court said specifically was it was circular reasoning, created a catch-22 that guaranteed an adverse credibility finding as to every witness. Indeed, while the independent hearing officer apparently found each witness credible enough to discredit each other's witnesses. So the court looked at that and said this is not substantial evidence, it's just a ruse for a shortcut to credibility rather than actually evaluating the testimony. And I submit to you, Judge Wynn, that that is what is going on in this case, and it's the same in the original hearing officer's decision, and after this court overturned that decision, he again just went back and did the same finding. And this is in light of Fusen and Soce. I mean, Soce also overturned that same type of finding, that witnesses are inconsistent with each other, that are found not credible, and therefore no one is credible. The counsel is Judge Gould, if I could ask you, interject a question. What evidence, did she have any documentary evidence of setting up a separate household? I'm thinking about the record, Judge. I don't think other than her testimony 24 years after the fact that she had documentation of like a lease or anything like that, she did not have anything like that. What she had was proof of employment with Coconino County and motel work and things like that, but she did not have anything besides her own testimony and her aunt's testimony regarding setting up a household. Okay, thank you, counsel. And no corroborating evidence regarding the sales either? She was given an opportunity to submit corroborating evidence that could have addressed some of these inconsistencies, and she didn't have any documents to submit? So the sales of, the traditional sales of Navajo kachinas, I'm sure everyone, Navajo Hopi kachinas, they're little dolls that are carved, deities, that are carved and sold throughout the reservation and border towns. So this agency, which is over these traditional Navajo relocatees, has recognized in their management manual that this type of work does not require documentation. And that's kind of the heart of the hearing officer's decision. If you go through it, he is rejecting anything that is not with paper documentation. However, this agency's own management manual, and the regulations say that they are ruled by their management manual. Operations are ruled by their management manual. So this agency specifically recognizes that these traditional people do not live on cash income and do not have to show that sort of documentation. And the hearing officer, in violation of his own agency's requirements, has ignored that. I didn't see anything in the record that required the submission of corroborating evidence. I think the record suggests that the opportunity to provide corroborating evidence was given because it could have resolved some of these conflicting inconsistencies, not just between her aunt and herself, but also within her own testimony as well. Twenty-four years later, Your Honor, they've delayed it 24 years, and then they're expecting this traditional Navajo elder to come forward and present documentary evidence that doesn't exist and probably didn't exist at the time. It was testified it didn't exist at the time, I believe. I understand. Do you want us to save a little bit of time? Yes, thank you, Your Honor. Good morning, Your Honors. May it please the Court, Emily Palachuk on behalf of the federal government. The Court should affirm O'Neill's denial of Ms. George's application for relocation benefits, and there are two principles that the Court needs to keep in mind in reviewing this case. The first is that Ms. George had the burden of bringing forth the evidence to show that she was a head of household by July 7th of 1986. And the second is the general principle under the APA that the Court is reviewing this for substantial evidence, that where two reasonable outcomes exist, the Court must defer to the agency's judgment. So under those standards, as the Court intimated earlier, there is an interwovenness to the credibility determinations and the decision that Ms. George was not eligible for benefits. And that comes down to the fact that that was the only evidence presented of non-documented income. So we have the documented income, which everybody agrees does not reach the $1,300 threshold for a presumption of household status. I saw different numbers in the record, at least one or two of which come pretty close to $1,300. Yes, Your Honor, I believe that's correct, that the numbers do come very close to the $1,300. So that suggests that exact numbers are difficult to obtain under these circumstances, right? I think just a couple of hundred dollars could have tipped it one way or the other. That's correct, Your Honor. And the reason that the... What do we do with that? Does that have any bearing on our evaluation of the evidence in this case? Well, it's important to remember that that $1,300, that is a presumption, and it came from the fact that that was the amount of general assistance. No, I understand that, but the point is we're within a couple of hundred dollars of the presumption. I think in one number, a hundred and something dollars away from the presumption, and presumptions are pretty significant in this context. Yes, Your Honor, but again, going back to the standards, it was Ms. Georgia's obligation to come forward with the evidence showing that she could meet that amount. The agency could not engage in speculation that she would have reached that amount had she had the documentation available. The fact of the matter is that the documentation wasn't there. When she was given the opportunity to present non-documentary information in the form of testimony, it was found to be not credible for many reasons. The hearing officer did not rely solely on credibility findings. I'll point out that he explained why this is a case that's different from the Soci case, and that's because in this case, you would expect to find documents available, and that's in part due to Ms. Georgia's own testimony. She testified that her brother-in-law usually documented everything, so I'm sure he has that in his record somewhere. She also testified that he is still in business, and then her aunt testified that she knew where he was still in business, namely a roadside outside of Page, Arizona. Altogether, that's enough information that Ms. George should have been able to meet her burden of finding documentary information, or at the very least, bringing her brother-in-law in to testify, where he could have filled in some of these gaps that we have in our knowledge about what exactly went on with this business. The other thing that the hearing officer points to is the fact, he says, that one can reasonably expect that a business with such a large alleged volume of production would have some sort of documentary trail, again, particularly because the applicant testified that her brother-in-law documented everything. That's in addition to the fact that Ms. Sands testified that they sold at places like Jack in the Box in Flagstaff, Arizona, a business that still exists to this day. Presumably, that's the type of business where if they were selling there, there would be records still available. Same with business offices like insurance offices. Ms. George, however, couldn't even present a name of a business that O'Neill could have gone back to to look or to call and ask if they had any documents that could have corroborated that information. Counseless Judge Gould, if I could ask you two quick questions. Yes. One is, am I correct that the decision here that we're making is reviewed under the APA? That is correct, Your Honor. And the second is, under the APA, am I right that we have to defer to the judgment of an agency? Yes, Your Honor. It's not arbitrary and capricious or contrary to law. Yes, Your Honor, that's correct. And that includes even if there might have been another reasonable interpretation here. For example, if it might have been reasonable to assume that Ms. George had met that extra $100, that's one outcome. But another outcome is to say it was her burden and she didn't come forward with that evidence, and therefore, she's not eligible for benefits. That's also a reasonable interpretation of the evidence in this case. And under that circumstance, the court must defer to the agency's determination. Thank you. Your Honor, I'd like to briefly talk about some of the inconsistencies because they were not just between Ms. Sands and Ms. George. There were also inconsistencies within each of their own statements. Looking at Ms. Sands, for example, the hearing officer found that she had a lack of reliable details, and that's something that this court in Cheng v. Holder said is a specific and cogent reason to find a lack of credibility. Additionally, in Ms. George's testimony, and if we look especially at the written submissions that were sent to O'Neill, in addition to her testimony, there are a lot of inconsistencies. One of those, for example, that the hearing officer talks about is respect with employment at an Arby's. Ms. George originally said that she was working full-time for full salary at an Arby's in Flagstaff in 1985. And then a few weeks later in another submission, she said that her first full-time employment wasn't until 1986, but again, this was at an Arby's in Flagstaff. And then there's no more mention of an Arby's at all in the record. There's no documentation about it, and there's no testimony about it. Despite the fact that allegedly she would have been working full-time at the Arby's, at the same time she's working 40 hours traveling around the state selling native crafts for her brother-in-law. There's also issues with who was making the kachina dolls. In one document, she says that it was her sister who was making them, and then in another, it's her brother-in-law and her brother who are making them. And then, of course, there's a lot of inconsistency about how much she was being paid, whether it was weekly, biweekly, how much specifically, and then the calculations, you know, $5 an hour doesn't add up to the numbers that she was giving for her weekly or biweekly pay plus her yearly pay. And then the other thing that the hearing officer pointed out is that she couldn't explain why she went from an easier job that she liked with her family members to a lower-paying, much harder job cleaning hotel rooms. The other thing that's missing from the information that would have been helpful to know would have been things like the price per unit or how many units were made and how many were sold. All of these things are things that just were not asked, and therefore, the testimony doesn't exist. And so, of course, we're talking about a number, the $1,300 here, but there is another way to show head of household status. But once again, we don't have any information outside of, you know, just non-income information about her head of household status. She says that she moved to an apartment with a high school friend, but there's no information about whether she was paying rent, whether she was paying for her food, transportation, utilities, all of these things that we would think of as traditionally items of self-support. And while she says that she was bringing some household items to her mother every two weeks, with respect to essentials, the only thing she says is sometimes we would even bring a little bag of groceries for her mom. Now, I think the hearing officer's recitation regarding that is insightful in that he said, and limited assistance to her parents is distinguishable from the substantial and ongoing assistance that Miss Georgia's sister provided for her in 1985 and 1986. Just briefly to touch on the delay issue, Your Honors, this was not properly presented to the agency. The first time that it was was during the supplemental proceedings after the remand, when the hearing officer was explicitly directed by this court to only look at three items. So that was not the proper time to try to bring up a new issue regarding delay. And with respect to the delay of hearing, what the regulations say is that it is 30 days from the date hearing is requested. And there's no indication in the record that the hearing was requested any earlier than 30 days before the hearing. And even if it was, the delay that's happened in this case is not one-sided. So for those reasons, Your Honor, we'd ask that you affirm the decision of the agency denying relocation benefits. Thank you, Counsel. So Miss George and her family have lived in this area beyond recorded history, as we say in Indian law, for time immemorial. They know the family. They give the family relocation benefits, but they withhold, they exclude Miss George from the application. When she tries to apply in 1985, they send her away. That's in the record. She is finally allowed, because the Herbert case says that the agency has violated due process by not properly notifying people of Miss George's class. She's finally allowed to apply. Her hearing, her appeal is on November 4th, 2009. That's when they received her appeal. Her hearing should have been December 4th, 2009, a month from November 4th, 2009. Instead, she receives the hearing three years and ten months after her requested hearing. That violates their own regulations. And that's on top of the delay from 1985, a 24-year delay. And then she's expected, with precision, to not only recall how much she paid in rent and every minutia of what this hearing officer thinks is self-support, and he ignores the facts, the undisputed facts that she, I'm sorry, she moved out of, on the determinative date of July 7th, 1986, she had moved out of her sister's home and was no longer working in that family business. She was not part of her mother and father's household. She was employed by Coconino County. She lived in an apartment with a roommate. If she was not self-supporting, who's supporting her? Who's supporting this young woman? Thank you, counsel. You're over time, but we very much appreciate your argument. And we appreciate the argument on behalf of the government as well. The matter is submitted. Judge Wynn. Yes, Judge Gould. I want to ask a question. Oh, of course. Oh, I'm sorry. I'm sorry, Judge Gould. I didn't hear you. The questions I have are, one, is this case reviewed under the APA? Whether the OHINC is reviewed under the APA, or is there a different standard to review its decisions? No, it is reviewed under the APA, Your Honor. But with regard to deference, I think the Loper case empowers this court to look beyond deferring to the hearing officer. And this hearing officer, and it's in the record, he denies 90 percent of his cases. That's an outrageous, outrageous denial rate. And that's at ER 367 to 370. Okay. Thank you, counsel. Thank you very much, counsel. The matter is submitted.
judges: GOULD, NGUYEN, VANDYKE